LUCIUS H. BIGLOW, JR. and NANCY W. BIGLOW, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Biglow v. Commissioner
Docket No. 20429-82.
United States Tax Court
T.C. Memo 1985-284; 1985 Tax Ct. Memo LEXIS 347; 50 T.C.M. (CCH) 126; T.C.M. (RIA) 85284; June 13, 1985. Lucius H. Biglow, Jr., pro se. Barry J. Laterman, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the taxable year 1977 in the amount of $40,102.10. The sole issue for decision is whether the payment of $82,505 [1] received by petitioner Lucius H. Biglow, Jr., in 1977 in conjunction with his withdrawal from a law firm where he had been a partner for 14 years is excludable from gross income as a *348 gift under section 102(a)[2] or is includable in gross income under section 61(a). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, Lucius H. Biglow, Jr., and Nancy W. Biglow, husband and wife, who resided in Bellevue, Washington, at the time of the filing of the petition in this case, filed a joint Federal income tax return for calendar year 1977 with the Internal Revenue Service Center, Ogden, Utah. Lucius H. Biglow, Jr. (petitioner), was a partner in the Seattle, *349 Washington, law firm, Perkins, Coie, Stone, Olsen & Williams, from 1963 through 1977. In 1977 when petitioner was 52 years old, he withdrew from the firm. In connection with his withdrawal the firm made certain payments to him. The business affairs of the firm were managed by an executive committee. In 1974, the managing partner of the law firm advised petitioner that petitioner had not found his niche at the firm. Petitioner offered to withdraw from the firm but the managing partner encouraged him to work in another area of the firm's practice in order to improve the situation. In late 1976, the executive committee reviewed petitioner's situation and decided that nothing had changed.On January 5, 1977, January 18, 1977, February 28, 1977, and March 15, 1977, discussions were held by the members of the executive committee with respect to petitioner's withdrawal from the firm. According to minutes kept of the January 5, 1977, meeting, the following discussion occurred with respect to petitioner's situation: [A member of the committee] reported that he and [another member] planned to meet with Mr. Biglow to advise him of the Executive Committee's decision that he was to *350 receive no bonus for the year and also to advise him of the deteriorating confidence of his partners in his abilities as a lawyer. Anticipating that this discussion may lead Mr. Biglow to again consider withdrawal from the firm, [a member of the commmittee] reported that he had asked [another member of the committee] to calculate Mr. Biglow's financial interest in the firm. This calculation showed that in addition to his undistributed income and capital account which vary in value from month to month, Mr. Biglow would be entitled to a sum of approximately $17,000 under the partnership terms covering withdrawal of a partner who thereafter does not practice law in the State of Washington. An additional calculation showed that as a withdrawing partner, Mr. Biglow would be giving up an interest in the Partners' Unfunded Retirement Plan that hypothetically had a present value also in the amount of $17,000. The Committee was hopeful that the firm could furnish the funds required by Mr. Biglow to make a transition to another career without regard to the strict limitations of his financial interests in the firm as defined by the partnership and retirement plan agreements. *351 To this end [a member of the committee] asked for and was granted the authority to offer up to $100,000 in connection with Mr. Biglow's separation. On January 7, 1977, petitioner met with members of the committee who advised him that his situation had not improved and that he would not be receiving a bonus. Petitioner notified them at this time that he intended to withdraw from the firm. According to the minutes kept of the January 18, 1977, committee meeting, the results of the January 7, 1977, discussion with petitioner were as follows: [A member of the committee] reported that following the discussion he and [another member of the committee had] with Mr. Biglow regarding the fact that [Mr. Biglow] was to receive no bonus, Mr. Biglow had determined that it would be in the best interests of himself and the firm that he withdraw from the partnership. Mr. Biglow was invited to propose a financial arrangement for separation that would enable him to make a transition to a new career. In this connection he was also invited to consult with [the firm's business manager] on the evaluation of his interest in the firm. Mr. Biglow had no definite job plans except *352 that it appeared he may seek employment at Puget Sound Power & Light. On January 18, 1977, petitioner was offered a position in the benefits department at Puget Sound Power & Light Co. In the minutes kept by the firm of the February 28, 1977, committee meeting the following appears: Mr. Biglow had been offered a position in the Benefits Department at Puget at a salary of from $20,000 to $30,000. [A member of the committee] requested and was granted authority, together with [another member of the committee] to make an offer to Mr. Biglow of $100,000 to be paid over four or five years. No deadline was to be placed on the acceptance of this offer; However, members of the Committee expressed the hope that Mr. Biglow's plans would crystallize in the near future. The following was reported in the minutes of the March 15, 1977, meeting: Mr. Biglow had concluded that the firm's offer of $100,000 to assist him in the transition into another career was very generous and he intended to accept it. Mr. Biglow also advised [members of the committee] that he had accepted the job offered him at Puget but that a date for announcement and transfer had not yet been set. Petitioner *353 withdrew from the firm as of July 1, 1977. On December 21, 1977, petitioner received a letter from the business manager of the firm which stated the following: In accordance with the understanding reached between you and the Executive Committee regarding your withdrawal from the firm, you were to receive $100,000 in lieu of the payments described in the partnership agreement for a withdrawing partner, and in lieu of any other interest in the firm or its assets. In addition, you were to receive your share of income earned by the firm up to the date of your withdrawal (July 1, 1977) as well as the amount that was still owed to you at the date of your withdrawal for the refund of a portion of your capital interest at the beginning of the year. (The refund of your remaining capital investment is included in the $100,000 payment.) Accordingly, I am enclosing the firm's check in the amount of $34,301.65 in final payment of your remaining interest in the firm, calculated as follows: Withdrawal payment
$100,000.00
Less: installments previously paid
70,000.00
$30,000.00
LHB share of firm income 1/1-6/30/77
20,149.49
Less: income previously distributed
18,337.33
1,812.16
Sale of capital investment 1/1/77
2,489.49
TOTAL
$34,301.65
*354 The partnership agreement executed between petitioner and the firm on January 1, 1975, provided the following with respect to the withdrawal or expulsion of a partner from the firm: 9. Events of Withdrawal of Partner.
9.1 If a partner withdraws from the Firm, he shall, upon withdrawal, cease to have any right, title or interest in and to the Firm's assets, including, but not limited to, its Capital Accounts and the properties reflected therein, and the Inventory; provided, however, that he shall retain and be paid his interest in the Firm's Undistributed Income as of the Date of Withdrawal. The books of account and records of the Firm shall be closed as of the Date of his Withdrawal, and the Capital Accounts shall be determined as of the Date of his Withdrawal. 9.2 In lieu of his interest in the Capital Accounts and the assets reflected therein, the Firm shall pay the withdrawing partner an amount equal to his interest therein, and the same shall be paid to him as determined by the Executive Committee, but in any event within twelve months after the Date of Withdrawal. 9.3 If a partner withdraws from the Firm in order to engage in the practice of law in the State *355 of Washington, other than as counsel to or as an employee of the Firm, he shall not be entitled to receive any payment reflecting an interest in the Inventory or have any further interest in the Inventory. 9.4 If a partner withdraws from the Firm for any purpose other than as described in subsection 9.3, in lieu of his interest in the Inventory, the Firm shall pay to him an amount to be determined by first multiplying the Net Income of the Firm for the calendar year prior to the year in which the Date of Withdrawal occurs by his participation percentage at the Date of Withdrawal and then applying to the latter amount a percentage which shall be computed by multiplying 2% by the number of full twelve (12) month periods during which he was a partner of the Firm prior to the Date of Withdrawal; provided, that the latter percentage shall not exceed 25%. Said amount shall be paid in approximately equal monthly installments over such period, not to exceed eighteen months following the Date of Withdrawal, as determined by the Executive Committee. Notwithstanding the foregoing, if within twelve months after the Date of Withdrawal, or prior to the expiration of the period determined *356 by the Executive Committee for the making of payments under this subsection 9.4, whichever is the longer period, the withdrawing partner engages in the practice of law in the State of Washington other than as counsel to or as an employee of the Firm, the withdrawn partner shall not be entitled to receive any further payments under this subsection 9.4, and he shall promptly repay to the Firm all amounts previously received by him under this subsection 9.4. * * * 10. Event of Expulsion of Partner. * * * If a partner is expelled before his 60th birthday, the provisions of the Retirement Plan shall not be applicable to him. Such partner shall, upon expulsion, cease to have any right, title or interest in and to the Firm's assets, including, but not limited to, its Capital Accounts and the properties reflected therein and the Inventory; provided, however, that he shall retain and be paid his interest in the Undistributed Income as of the Date of Expulsion. The books and records of the Firm shall be closed as of the Date of Expulsion. Based thereon the Firm shall pay to the expelled partner for his interest in the Capital Accounts and properties reflected therein, an amount equal *357 to his participation percentage at the Date of Expulsion applied to the value of such Capital Accounts. Payment of said amount shall be made to him within six months after the Date of Expulsion. The expelled partner shall not be entitled to receive any payment reflecting an interest in the Inventory or have any further interest in the Inventory. In lieu thereof, and of any other interest in the Firm, its assets and business, the Firm shall pay to him one half of an amount equal to the Net Income of the Firm for the year prior to the year in which the Date of Expulsion occurs multiplied by his participation percentage at the Date of Expulsion, said amount to be paid in approximately equal monthly installments over such period, not to exceed eighteen months following the Date of Expulsion, as determined by the Executive Committee. Neither the expelled partner nor his spouse, widow, children, personal representatives, heirs or assignees shall have any right to any payment or benefit under this Agreement or under the Retirement Plan, except as specifically provided in this Section 10 with regard to him, and the Firm shall have no obligation to make any such other payment. *358 The firm made total payments to petitioner in 1977 in the amount of $131,146. [3] According to the Schedule K-1 filed by the law firm in 1977, petitioner received taxable income from the partnership in the amount of $115,398. The payments petitioner received from the firm in 1977 consisted of petitioner's capital interest in the firm, his share of firm earnings from January 1, 1977 through June 30, 1977, and a withdrawal payment in the amount of $82,505. Pursuant to the terms of the partnership agreement, petitioner was entitled to his capital interest in the firm, his interest in the firm's undistributed income and, if he did not practice law in the State of Washington, an additional withdrawal benefit in the amount of $12,744. Pursuant to Article 10 of the partnership agreement, if petitioner had been expelled from the firm he would have been entitled to receive an additional payment in the amount of $25,488. *359 On his 1977 Federal income tax return, petitioner reported income in the amount of $32,893 from the practice of law with the firm from January 1, 1977 through June 30, 1977. On Schedule E attached to his 1977 Federal income tax return, petitioner characterized the unreported payment from the firm as one "to which [he] was not entitled and for which [he] did not negotiate. This sum is not included in the above figures [reported as income on his return]. The payment was in essence an act of private charity." In his statutory notice of deficiency issued to petitioners for taxable year 1977, respondent increased petitioners' taxable income by the amount of $82,505 with the following explanation: The $82,505 you received during the taxable year 1977 as payments from the Perkins, Coie, Stone, Olsen and Williams Partnership is taxable as ordinary income under Section 61(a) of the Internal Revenue Code. It has not been established that this amount represented a gift from such Partnership. Figures are as follows: Ordinary income--Sch. K-1
$115,398
Ordinary income--return
32,893
Increase to ordinary income
$ 82,505
OPINION *360 Section 61(a) provides that "gross income means all income from whatever source derived." Section 102(a) excludes from gross income the value of property acquired by gift. Whether a payment is a gift under section 102(a) or gross income under section 61(a) is a question of fact to be determined from all the circumstances surrounding the payment. Although some of the criteria to be considered in determining whether a transfer constitutes a payment of income or a nontaxable gift have been set forth in numerous cases, the issue "remains basically one of fact, for determination on a case-by-case basis." Commissioner v. Duberstein,363 U.S. 278, 290 (1960). Petitioner bears the burden of proving that the payment he received when he withdrew from the partnership constituted a gift. Rule 142(a), Tax Court Rules of Practice and Procedure. *361 In Duberstein, the Supreme Court stated (363 U.S. at 285-286): [A] voluntary executed transfer of his property by one to another, without any consideration or compensation therefor, though a commonlaw gift, is not necessarily a "gift" within the meaning of the statute. For the Court has shown that the mere absence of a legal or moral obligation to make such a payment does not establish that it is a gift. * * * And, importantly, if the payment proceeds primarily from "the constraining force of any moral or legal duty," or from "the incentive of anticipated benefit" of an ecomonic nature, * * * it is not a gift. And, conversely, "[w]here the payment is in return for services rendered, it is irrelevant that the donor derives no economic benefit from it." * * * A gift in the statutory sense, on the other hand, proceeds from a "detached and disinterested generosity," * * * "out of affection, respect, admiration, charity or like impulses." * * * And in this regard, the most critical consideration, as the Court was agreed in the leading case here, is the transferor's "intention. *362 " * * * "What controls is the intention with which payment, however voluntary, has been made." * * *. [Citations and footnote omitted.] Petitioner argues that the $82,505 he received in connection with his withdrawal from the law firm is a nontaxable gift because the firm was not required by the terms of the partnership agreement or by any other contractual arrangement to make the payment to him.The payment was in addition to all other payments provided for by the partnership agreement and was not made in liquidation of his interest as a retiring partner and was not made in order to compensate him for unbilled time. petitioner stresses the fact that the firm did not have a policy of making gifts or other special payments to withdrawing partners and in fact had never before made a similar payment to a withdrawing partner. [4] Petitioner claims that the payment was not made for services he had rendered or would render in the future or for any other consideration. Petitioner states that he had been fully paid for services rendered in the past and the firm did not make the special payment in order to obtain a business advantage or economic benefit, nor was it motivated by *363 an incentive of anticipated economic benefit. Petitioner concludes that the payment proceeded from the firm's detached and disinterested generosity and was made out of the affection, sympathy and personal respect the other partners had for him. Petitioner states that the motive of the firm in making the payment was its charitable desire to help him through a financially difficult career transition. Respondent contends that the payment of $82,505 received by petitioner in connection with his withdrawal from the law firm is includable in his gross income because the payment was made to maintain the firm's selfimage. *364 Respondent reasons that if petitioner's separation from the firm had been unfriendly and resulted in litigation, it could have damaged the firm's public image. Respondent emphasizes that the absence of a legal or moral obligation to make the payment to petitioner does not preclude it from being taxable income rather than a gift. Respondent concludes that petitioner received the payment in appreciation for his length of service, his loyalty to the firm and his willingness to depart voluntarily. Under these circumstances, respondent takes the view that the payment is not a gift but a distribution of firm income to petitioner. The firm anticipated the economic benefit of retaining petitioner's goodwill and maintaining the firm's own self-image. Respondent recognizes that the characterization of the payment by the firm as a distribution of income to petitioner is not conclusive but argues that this characterization is indicative of the intent of the firm in making the payment. [5]
*365 Applying the principle set forth in the case law to the facts of this case, we conclude that the $82,505 petitioner received from the law firm is not a gift within the meaning of section 102(a), but is includable in petitioner's taxable income for 1977 under section 61(a). The absence of the firm's legal obligation to make the payment to petitioner does not preclude it from being taxable income. [6]
*366 Based on Commissioner v. Duberstein,363 U.S. 278, 285 (1960), we conclude that the payment petitioner received was not motivated by a "detached and disinterested generosity." The partnership agreement provided that petitioner was entitled to a payment in the amount of $12,744 if he voluntarily withdrew from the firm, but if he was expelled from the firm he was entitled to a payment in the amount of $25,488. By withdrawing, petitioner lost all his rights in the firm's retirement program. In our view, the $82,505 payment the firm made to petitioner represented severance pay voluntarily paid as additional compensation for petitioner's past services and his loyalty to the firm. In addition, petitioner was compensated for his willingness to withdraw peacefully from the law firm after being a partner for 14 years. The law firm anticipated an economic benefit by retaining petitioner's goodwill and a good image for the firm. Miller v. United States,362 F.Supp. 1242, 1245 (E.D. Tenn. 1973). Petitioner relies only on Stanton v. United States,186 F.Supp. 393 (E.D.N.Y. 1960), affd. 287 F.2d 876 (2d Cir. 1961), *367 a case which was decided in a remand by the Supreme Court which heard the prior Stanton case with Commissioner v. Duberstein,supra.Petitioner in his brief states that the Stanton case "is the only case in point with petitioner's case." He argues that the facts in all other cases are clearly distinguishable. In our view the facts in the Stanton case are clearly distinguishable from those in the instant case. That case involved a payment by Trinity Church to a departing employee who had been president of the church's real estate subsidiary. The district court concluded that the vestry of the church considered the payment a gift. After analyzing the reasons for the payment and the nature of the church's real estate subsidiary the court stated that this was "the aspect of the case that renders it unique so far as the reported cases disclose." 186 F.Supp. at 395. There is nothing unique in a law firm making an income distribution to a withdrawing partner. in our view this is simply a case of an income distribution to a partner who was *368 willing to withdraw voluntarily when the management of the firm no longer considered his continuing as a partner to be beneficial to the firm. We hold that the $82,505 payment to petitioner is not a gift and thus it is includable in petitioner's income under section 61(a). Decision will be entered under Rule 155.
Footnotes
1. The notice of deficiency states that the firm's special payment to petitioner was in the amount of $82,505. At trial petitioner contended the amount of the payment was $83,924.38. According to the Schedule K-1 filed by the law firm in 1977, petitioner received taxable income from the partnership in the amount of $115,398. Petitioner reported on his 1977 return gross income from the firm in the amount of $32,893. This leaves unreported income in the amount of $82,505 as determined by respondent. ↩
2. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year here in issue.↩
3. The record reflects conflicting figures regarding the character and amount of each payment made by the firm to petitioner in 1977. On March 28, 1978, petitioner refunded to the firm an overpayment of firm income he had received in the amount of $1,009.41.↩
4. At the trial petitioner asked a witness who was a member of the executive committee of the firm whether payments comparable to the payment made to him had been made to specifically named other attorneys who had withdrawn from the firm. The witness testified that each of these withdrawing partners had been paid in accordance with the partnership agreement. However, the record does not show the amount of payment received by these individuals and insofar as the record shows, the payment in absolute amount may have exceeded the payment made to petitioner.↩
5. One of the members of the executive committee in response to a question of whether the members of the executive committee assumed that the payment was a distribution of income to petitioner, testified: That certainly was the assumption under which I was operating as a member of the committee. I can't testify to what the others thought or believed because I don't recall having a discussion of it. The only other member of the executive committee to testify was the person who was chairman of the committee when petitioner left the firm. He stated in regard to the treatment of the payment by the firm: I had thought that, regardless of our motives, that it would be treated as an income tax deduction for the firm in effect and would be income to you. In a letter of July 30, 1981, from this witness to petitioner, the firm's motives for the payment were described as-- an effort by us to ease any disappointment you might feel that your situation here had not proved as successful as we all had hoped; in gratitude for your being a good sport about it; and to reflect in a tangible way our desire to say "Godspeed" to a friend. The witness's description of the reasons for the payment in his testimony were in more detail but to the same effect. The clear indication from the record as a whole is that the representatives of the firm considered that the firm was making an income distribution to petitioner for his long service to the firm and his willingness to voluntarily withdraw.↩
6. The facts in this case are quite similar to those in Ruestow v. Commissioner,T.C. Memo. 1978-147, affd. without published opinion 595 F.2d 1209 (2d Cir. 1979). Petitioner attempts to distinguish the Ruestow case on the basis that the law firm that made the payment to the taxpayer in that case had made similar payments to other employees. However, this fact was not the basis of our conclusion in the Ruestow case. In the instant case there is no showing that anyone had previously withdrawn from the firm under conditions similar to those involved in petitioner's withdrawal. We see no substantive factual distinction in the Ruestow↩ case and the instant case.